Central Asphalt Paving Company, Inc. v. Commissioner.
Central Asphalt Paving Co. v. Commissioner
Docket No. 5418-66.
United States Tax Court
T.C. Memo 1968-225; 1968 Tax Ct. Memo LEXIS 80; 27 T.C.M. (CCH) 1100; T.C.M. (RIA) 68225; September 30, 1968. Filed John T. Kay, Jr., 511 Charleston National Bank Bldg., Charleston, W. Va., for the petitioner. Rodney G. Haworth, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined the following deficiencies as to petitioner's income tax: Taxable year ended June 30, 1960
$ 4,832.94
Taxable year ended June 30, 1961
$28,123.06
Taxable year ended June 30, 1962
$43,623.84
Taxable year ended June 30, 1963
$21,991.98
The parties have reached agreements regarding all adjustments determined save one, so that the sole issue remaining for our decision is whether annual payments made by petitioner to Josephine Cash of $5,200 and related taxes thereon of $208 annually are deductible as ordinary and necessary business expenses of petitioner for its fiscal *81 years ending June 30, 1961, 1962, and 1963. The deficiency determined for petitioner's fiscal year ended June 30, 1960, is now entirely dependent upon our holding as to the sole remaining issue in petitioner's fiscal 1963. Some of the facts have been stipulated and they are so found. Petitioner was incorporated on June 9, 1956, under the laws of West Virginia. Its income tax returns for its fiscal years in issue were filed with the district director of internal revenue, Parkersburg, West Virginia, and its principal office was located in Charleston, West Virginia, at the time the petition herein was filed. At the time of its incorporation petitioner's stock was issued as follows: Shareholders
Shares
R. E. Cash
20
V. N. Green
20
M. M. Lilly, Jr
16
D. S. Long
16
J. M. Slack, Jr
16
J. W. Green, Jr
4
H. F. Johnson
4
W. G. Clendenin 4
Total
100 1101 Petitioner had been formed to, and from the time of its incorporation through the years in issue did, engage in the highway construction business. Its 100 shares of stock had been issued for $100 per share. Shortly after its formation petitioner commenced borrowing various sums of money from the *82 Kanawha Banking and Trust Company (hereinafter called bank) for use as working capital. The highway construction business is highly hazardous, consequently as a condition to making these loans, bank required that petitioner's notes be personally endorsed by petitioner's principal stockholders and during 1956 and until the unexpected death of R. E. Cash (hereinafter sometimes called Cash) on June 7, 1957, bank required such endorsements by R.E. Cash, V.N. Green, M.M. Lilly, Jr., D.S. Long, and J.M. Slack, Jr. R.E. Cash died still owning his 20 shares of petitioner's stock. Josephine Cash (hereinafter referred to as Josephine), his widow, was his sole heir and acquired these shares as a part of his entire net estate. I. Noyes Smith was president and chief executive officer of bank when R.E. Cash died and throughout the years in issue. He had known Cash and had conducted business for bank with him since about 1927 and knew that at the time of his death Cash was a man of substantial net worth. He also knew that Josephine was beneficiary of his entire net estate and that she was maintaining good cash balances in bank. When Cash died petitioner had been in business for only one year. *83 Cash was an endorser (together with Green, Lilly, Jr., Long and Slack, Jr., petitioner's other principal shareholders) of petitioner's note for $50,000 to bank and bank insisted that petitioner either furnish collateral or an acceptable substitute endorser to replace the security which had been afforded by the endorsement of R. E. Cash. In November 1957 bank agreed with petitioner that the endorsement of Josephine Cash was so acceptable to bank and at that time the outstanding loan was reduced to $35,000 and the note was endorsed by Josephine, Green, Lilly, Jr., Long and Slack, Jr. The record is silent as to petitioner's net worth in November 1957 but it shows that on October 1, 1957, its net worth was about $25,000 and that on June 30, 1958, its net worth was $35,917.21. Josephine continued to endorse renewals of the above $35,000 note until March 31, 1961, at which time bank advised her that it had decided to accept renewals of said note without her endorsement and she has not been required to endorse any of petitioner's paper since that time. On May 23, 1958, Josephine sold to petitioner the 20 shares of petitioner's stock which she had acquired from her late husband's estate *84 for $100 per share (total $2,000). The petitioner's net worth at May 23 is not shown of record but as noted above it was $35,917.21 or $359.17 per share on June 30, 1958. After such sale Josephine had no financial interest in petitioner. During 1958 bank was still requiring collateral or a substitute endorser for R.E. Cash on petitioner's paper and petitioner requested Josephine to continue endorsing its notes to bank. She refused to do so until October 11, 1958, on which date she and petitioner entered into the following contract: THIS AGREEMENT, Made and entered into this 11th day of October, 1958, by and between JOSEPHINE CASH, widow of R.E. Cash, party of the first part, and CENTRAL ASPHALT PAVING CO., party of the second part. WHEREAS, the party of the second part has required and will require from time to time the benefit of the endorsement of the party of the first part to enable it from time to time to borrow money and make certain other commitments and perform certain contracts: NOW, THEREFORE, in consideration of the use of the name of Josephine Cash in the endorsement of certain notes that Central Asphalt Paving Co. may from time to time give to other persons, which *85 endorsement is to be for accommodation only, whether said notes are signed by Josephine Cash as maker or as endorser, which endorsement or accommodation maker shall be given upon the request of Central Asphalt Paving Co., and the further consideration that the Central Asphalt Paving Co. shall indemnify and hold harmless the said Josephine Cash against any loss, cost or expense in connection with her said endorsement, the Central Asphalt Paving Co. covenants and agrees that it will pay, or cause to be paid, to Josephine Cash, beginning seventy (70) weeks after the date of the death of R.E. Cash, deceased husband of Josephine Cash, the sum of One Hundred Dollars ($100.00) per week for each and every week thereafter for and during the remainder of her natural life. 1102 IN WITNESS WHEREOF, the party of the first part has signed her name and affixed her seal, and the party of the second part has caused its corporate name to be signed and its corporate seal to be affixed hereto by its duly authorized officer, the day and year first above written, [Signed] Josephine Cash (SEAL) CENTRAL ASPHALT PAVING CO., By: [Signed] Victor N. Green Its President Josephine was born December 26, 1881, and *86 had suffered a severe heart attack in 1957. She had been in the hospital at the time of the death of R.E. Cash and was unable to attend his funeral. Her health had improved somewhat by the time she entered into the contract with petitioner in October 1958, but it was still not robust. At the time of trial herein she was confined to a wheelchair and lived in a nursing home in Huntington, West Virginia. When Josephine's 20 shares were redeemed by petitioner in 1958 they were not reissued and consequently the holders of the remaining 80 shares then owned 100 percent of the company. In March 1961 V. N. Green, J. M. Slack, Jr., and J. W. Green, Jr. (brother of V. N. Green) acquired 100 percent ownership of petitioner (in the ratio of 20, 20 and 4, respectively) by having petitioner redeem 40 shares of stock from all of the other original shareholders and issue 4 shares of stock to J. M. Slack, Jr. The redemption and issue prices were identical at $3,414.75 per share. These transactions occurred on March 11, 1961. The record is silent as to petitioner's net worth on that date but it is stipulated that if petitioner's books had been closed on January 31, 1961, a net worth of $327,827.23 *87 would have been shown. This amounts to a book value per share of petitioner's stock which was then outstanding (80 shares) of $4,097.84 and this was the figure available to the shareholders when they negotiated the redemption and issue prices of $3,414.75 per share in connection with the March 11, 1961, transactions. Petitioner has paid Josephine $100 each week since the signing of the contract of October 11, 1958, and on its returns for fiscal 1961, 1962, and 1963 it claimed deductions therefore as "wages" in the annual amounts of $5,200 plus employment taxes thereon of $208 ($5,408 annually). Respondent has determined that such amounts "are not deductible as ordinary and necessary expenses under section 162 of the Internal Revenue Code." Although petitioner had deducted the payments to Josephine as wages, respondent has simply determined that they are not allowable as ordinary and necessary expenses under section 162[1] and petitioner does not now contend that the payments were actually wages or a salary but urges that they are an ordinary and necessary business expense incurred to secure Josephine's endorsements of its paper and her agreement to endorse *88 such paper on request. Respondent argues strenuously that the payments to Josephine during the years in issue are related exclusively to the "grossly inadequate" amount paid to her for her stock in petitioner and states that such payments were solely to compensate her for the disparity between the amount paid for her stock and its true value. Respondent's argument and conclusion is entirely based upon a comparison of the $100 per share paid to Josephine with the $3,414.75 per share paid for the same stock "a short period of time" later. Respondent's reasoning omits many highly relevant factors, among the most important of which are the following: R.E. Cash had died just one year after petitioner's formation and the sale of Josephine's stock occurred less than one year thereafter, and at a time when its book value was $359.17 per share. The subsequent transactions at $3,414.75 per share occurred on March 11, 1961, almost three years after the redemption of Josephine's stock and its book value near such date was $4,097.84 per share. [2]
*89 On May 23, 1958, petitioner was simply redeeming 20 percent of its outstanding shares which action had no appreciable effect upon the percentages of ownership of the remaining shareholders. On March 11, 1961, three of petitioner's original eight shareholders were acquiring 100 percent control of the corporation 1103 and V. N. Green and his brother, J. W. Green, Jr., were acquiring a combined 60 percent control of petitioner. No citation of authority is necessary for the proposition that shares of a closely held corporation command a relatively higher price in the market place when control of the corporation accompanies their purchase. Respondent argues that the payments to Josephine were neither ordinary nor necessary business expenses of petitioner because her endorsements of its paper were not really required and did not amount to anything anyway because of petitioner's indemnity agreement incorporated in the October 11, 1958, contract. We disagree. Obviously the indemnity agreement is of value only so long as petitioner remains solvent and therefore it is of value only while Josephine is experiencing no hazard because of her endorsements. As soon as she is in jeopardy *90 the worth of the indemnity agreement will have deteriorated pro rata. Such an indemnity agreement is worthless. Examining now the remainder of respondent's argument, we note that I. Noyes Smith, the president and chief executive officer of bank during the years in issue, was called as a witness by petitioner and that his testimony was unequivocal to the effect that on the death of R. E. Cash the bank demanded a substitute for the security of his endorsement either in the form of collateral or an acceptable substitute endorser. Josephine retained a 20 percent ownership of petitioner between the time of her husband's death on June 7, 1957, and until her stock was redeemed on May 23, 1958. During this period of time she became an endorser on petitioner's note for $35,000 and it is understandable that she made no monetary demands upon petitioner for doing so. After the redemption of her stock, Josephine retained no interest in petitioner but bank was still requiring a substitute for the endorsement of R. E. Cash and we look upon the terms of the October 11, 1958, contract as not at all unreasonable. At this time petitioner corporation had been in existence for less than two and one-half *91 years, its business was hazardous and it could not have known for how long Josephine's endorsements would be required. She was then almost 77 years of age, had had a severe heart attack, and was in poor health. An agreement to pay her $100 a week for the remainder of her life under such circumstances and in return for her undertaking to endorse petitioner's notes, which endorsements or some acceptable substitute were then being required by petitioner's bank seems to us entirely reasonable. Respondent urges that she has not been required to endorse any paper since March 31, 1961, but that the $100 weekly payments continued to be made. Respondent overlooks the fact that under the agreement of October 11, 1958, Josephine remained liable to endorse and still remains so liable. The issue in the instant case is of course purely factual. We note, however, that surprisingly similar factual situations were dealt with in M. A. Long, 8 B.T.A. 737 (1927), acq. VII-1 C.B. 19; and in Monroe Sand & Gravel Co., 36 B.T.A. 747 (1937). [3]
*92 From all of the foregoing we conclude and hold that payments of $5,200 annually made to Josephine during petitioner's fiscal years 1961, 1962, and 1963, were ordinary and necessary business expenses of the petitioner under the provisions of section 162 of the Internal Revenue Code and are deductible by it. Such payments were properly made to Josephine under the agreement of October 11, 1958. However, the related wage or salary taxes that petitioner paid thereon in the amounts of $208 in each of these same years were neither ordinary nor necessary as Josephine was not, and is not now claimed to have been, an employee of petitioner, and consequently respondent's determination is sustained as to each of these $208 payments. Decision will be entered under Rule 50. 1104 Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. If the same ratio between book value and redemption price had been used on May 23, 1958. as was used on March 11, 1961, then Josephine's 20 shares would have been redeemed for $4,906 instead of the $2,000 which was actually paid.↩
3. See also Davis B. Thornton, Transferee et al., a Memorandum Opinion of this Court dated January 11, 1945 [Dec. 14,324(M)].↩